**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BELNICK, INC.,** | : | **Civil No. 1:13-CV-1298** |
| | : | |
| **Plaintiff/** | : | **(Chief Judge Conner)** |
| **Counterclaim Defendant** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **v.** | : | |
| | : | |
| **TBB GLOBAL LOGISTICS, INC.,** | : | |
| | : | |
| **Defendant/** | : | |
| **Counterclaim Plaintiff** | : | |

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION AND STATEMENT OF THE CASE

The plaintiff and counterclaim defendant in this action, Belnick, Inc. ("Belnick"), is a North American furniture distributor, based in Canton, Georgia. The defendant and counterclaim plaintiff is TBB Global Logistics, Inc. ("TBB"), a transportation broker and third-party logistics provider ("3PL") based in New Freedom, Pennsylvania, which assists distributors in obtaining shipping rates from a fleet of carriers that are under contract with TBB.

In November 2005, Belnick and TBB entered into a written contract (the "Subscriber Agreement") that obligated TBB to act as Belnick's broker in negotiating rates directly with third-party motor carriers that would, in turn, transport Belnick

furniture to destinations throughout the United States.  (Doc. 45, Ex. A, Subscriber Agreement.)  Belnick's efforts to extricate itself from this contract, and its agreement in November 2012 to begin working with another 3PL, the Transportation Services Group ("TSG"), led to the filing of this lawsuit in 2013.

The Subscriber Agreement committed Belnick to use TBB's brokerage services for at least 90% of its shipments during the term of the contract, which was an annual contract that contained an evergreen clause that caused it to be renewed on a yearly basis if Belnick did not provide notice of termination within 60 days of the end of each annual term.  The Subscriber Agreement obligated TBB to provide Belnick with a variety of shipping and brokerage services, including pre-auditing of freight services, tracing and expediting of specific deliveries, freight routing, advising regarding transportation matters, negotiating rates, and providing shipping rates to enable Belnick to make efficient shipment and distribution decisions.

In particular, the Subscriber Agreement provided that TBB would provide "rate quote information from public information sources or from private information material maintained by [TBB] on specified shipment movements."  (Id.)  The terms of the contract provided that these rates would be available to Belnick on the day of the quote, but would not be guaranteed beyond that day.  (Id.)  Additionally, with respect to freight routing, TBB agreed to use its best efforts to route shipments at

2

competitive prices, but did not guarantee that the lowest rates would always be used. (Id.)  Belnick represents that the Subscriber Agreement is the only written contract that the parties entered into, and that it "remained in full force and effect throughout the business relationship."  (Doc. 64, Belnick Statement of Undisputed Facts, ¶ 8.)

Although the parties only entered into one written agreement, and although Belnick has represented that the Subscriber Agreement is the written contract that "remained in full force and effect," Belnick also contends that TBB made a number of additional oral promises and commitments over time that had the effect of persuading Belnick to continue under the parties' agreement, or otherwise had the effect of clarifying or modifying the terms of the Subscriber Agreement, with respect to the provision of certain types of rate information, and with respect to the timeliness of that rate information.  Additionally, Belnick maintains that it never used TBB for 90% of its shipment needs, something that Belnick contends TBB knew for years and never complained about.  According to Belnick, as a result of this silence TBB should now be estopped from asserting this contractual provision.  As discussed in greater detail below, both of these factual assertions regarding oral modifications of the parties' agreement and the waiver of the written contract's 90% shipment requirement are hotly disputed by the parties on a murky factual record.

3

The parties relationship grew strained in or around 2010.  Belnick claims that around this time, it was in regular communication with TBB about its need for something referred to in this case as "real time rates," as well as rate information for a third-party carrier not under contract with TBB, RoadRunner.  According to Belnick, TBB understood Belnick's need for this information, and promised to make the information available to Belnick, despite having neither the ability nor the intention to do so.  Belnick claims that TBB repeatedly failed to perform its basic obligation under the parties' contract to provide access to "real time rates" and related shipping information, and maintains that TBB's failure to provide rates over a stable computer system were so extreme and so pervasive as to render the contract null and void and entitled Belnick to cancel the contract.  Belnick also claims that TBB's conduct during this time was marked by bad faith, a failure to act in Belnick's best interests, and that TBB engaged in tortious interference with Belnick's business interests and relationships with third parties.

In 2012, Belnick began looking to partner with TSG, another 3PL.  In November 2012, Belnick entered into an agreement with TSG, and in February 2013, Belnick notified TBB that it was terminating the Subscriber Agreement.  Belnick did not, however, give the required 60 days written notice required under the Subscriber Agreement, and, therefore, TBB responded by accepting Belnick's termination

effective on October 31, 2013, which would mark the end of the then-current term of the contract.  This eight month dispute over the timing of the dissolution of this business relationship led directly to the initiation of this litigation, with Belnick claiming that TBB breached the Subscriber Agreement in ways so fundamental as to entitle Belnick to unilaterally terminate the contract, and claiming that TBB had engaged in a host of tortious activity that highlighted what Belnick now claims was a pattern of bad-faith conduct on TBB's part, which should permit both cancellation of the parties' contractual relationship and the recovery of damages.  (Doc. 45; Doc. 69, TBB Statement of Facts, ¶¶ 20-28.)   Belnick has not performed under the Subscriber Agreement after May 10, 2013.  (Id. ¶ 31.)

Under the Subscriber Agreement, TBB provided shipping rate quotes to Belnick directly through TBB's system, and also directly to Belnick's potential customer's through TBB's system that interfaced with Belnick's customer-facing website.  (Id. ¶ 32.)  Despite the volume of briefing and explanation regarding Belnick's claims, it appears that Belnick's contract claim really comes down to an assertion that TBB was not providing Belnick and its customers adequate access to rates, since TBB's system was frequently unavailable, and was increasingly marked by "significant periods of down time, [and] inability to access rates." (Id. ¶ 33, Tab 19, First Belnick 30(b)(6) Dep., 89:25-90:10.)  The fundamental dispute at the heart

5

of this action is the nature and scope of the rate information that TBB was obligated to provide, and the quality of the service actually provided.

With respect to these core issues, Belnick take the broader view, contending that TBB had a duty to act in good faith, and to provide a stable system that Belnick and its customers could use, and also that TBB committed itself to providing "real time rates" and access to specific shipping information.  TBB takes a far narrower view of the parties' arrangement, arguing that its obligation was no more than that specified in the language of the Subscriber Agreement, which required TBB only to "provide rate quote information from public information sources or from private information material maintained by [TBB] on specified shipment movements." (Doc. 45, Ex. A, Subscriber Agreement, Section A(4).)  TBB thus contends that Belnick's contract theories in this case lack a factual basis, are not grounded in the terms of the Subscriber Agreement itself, which TBB claims was never amended orally or otherwise, and constitute little more than a transparent and improper attempt by Belnick to get out of the contract.

Alternatively, to the extent that one or more of the alleged additional obligations could be read into the contract, or were imposed upon TBB through oral modification of the Subscriber Agreement, TBB argues that the evidence compels a finding that TBB did not breach those obligations.  TBB also contends that Belnick's

supplemental tort claims necessarily fail as a legal matter because federal law governing the relationship between shipping brokers and customers like Belnick expressly preempts such extra-contractual remedies that relate to shipping rates and services.

Lastly, TBB argues that it is entitled to summary judgment on its own counterclaims that Belnick breached its own obligation to use TBB's services for 90% of its shipping business under the contract, and is liable for liquidated damages pursuant to an agreed-upon formula as a result.  TBB also brings counterclaims alleging that Belnick breached the contract by disclosing confidential business information to third parties, and that Belnick violated the Pennsylvania Uniform Trade Secrets Act, essentially by the same conduct.  TBB also seeks recovery of liquidated damages for these allegedly wrongful disclosures.

The parties engaged in extensive and often contentious discovery, and have filed cross-motions for summary judgment on the claims and counterclaims in this case.  These motions have been accompanied by hundreds of pages of written materials and documentary exhibits, and the parties further supported their motions through oral argument before the undersigned.  With the benefit of this argument, and upon thorough review of the parties' comprehensive briefing and evidentiary

submissions, it will be recommended that the motions be granted in part and denied in part.

First, it will be recommended that the Court grant TBB's motion with respect to Belnick's tort claims set forth in Counts II-IV of the amended complaint for tortious interference with prospective contractual relations, fraudulent inducement, and breach of fiduciary duty.  Despite Belnick's arguments to the contrary, we find that these claims are preempted by section 14501(c)(1) of the Interstate Commerce Commission Termination Act, 49 U.S.C. § 14501(c)(1), a federal statute governing the transportation, shipping and brokerage industry, which contains a broad preemption provision barring enforcement of state laws and regulations, including claims in tort, that seek to impose extra-contractual obligations that relate to shipping rates and services – which Belnick's tort claims clearly do.  For the reasons explained below, we agree with numerous federal courts that have found the ICCTA preempts precisely the kinds of state-law tort claims that Belnick attempts to package with its contract claims in this case, since those claims relate directly to TBB's role as a broker of shipping rates for Belnick, and would impose new and different duties than the parties agreed upon.

However, it will be recommended that the Court deny the parties' motions to the extent they separately seek summary judgment on Belnick's contract claims, since

the evidence is replete with disputed issues of fact with respect to exactly what the contract required of the parties, what the parties intended TBB would provide to Belnick with respect to rate information and other brokerage services, whether TBB satisfied those commitments, whether the parties modified the Subscriber Agreement, and whether any terms of the Subscriber Agreement were waived.

We will also recommend that the Court deny Belnick's motion for summary judgment on TBB's counterclaims. TBB has come forward with substantial evidence to show that Belnick was in breach of the parties' contract over a number of years by disregarding a 90% minimum usage requirement with respect to using TBB's services for its shipping needs. Belnick insists that TBB waived enforcement of this provision by its failure to invoke the provision over years of dealing, and because TBB has long known that Belnick was using the services of other providers, but we do not find that it clear as a matter of law that TBB has waived its claim. This counterclaim, and Belnick's affirmative defense, are dependent upon disputed issues of fact that do not admit of resolution on summary judgment.

We also disagree with the parties that summary judgment is appropriate on TBB's claims that Belnick breached the Subscriber Agreement and Pennsylvania law by disclosing sensitive trade secrets and other confidential commercial information to third parties, since the record is disputed as to whether the information that Belnick

shared is necessarily confidential or otherwise a trade secret, and because final disposition of this claim should await testimony and presentation of evidence to describe the nature of the information disclosed, and any damages sustained as a result.

Finally, we believe that resolution of the underlying contract claims is necessary before any judgment can be made as to what damages, if any, are owed in this case for any breaches that may be proven.  TBB seeks recovery of liquidated damages pursuant to a particular formula that the parties agreed to in the Subscriber Agreement that calls for damages to be paid based upon a calculation of the historical gross net profit that TBB would have billed but for the breach.  TBB seeks to recover damages under this provision both for Belnick's asserted breach of the 90% usage provision, as well as for the alleged disclosure of confidential information.  TBB claims that it is entitled to recover separate damages for both alleged breaches based on the same contractual formula, but it is not clear that such a recovery is warranted, or whether the liquidated damages instead constitutes an unenforceable penalty under Pennsylvania law.  Whether any such breaches occurred, and whether such breaches were waived by TBB, remain questions that should be resolved before any determination is made about what damages, if any TBB, is entitled to recover.

10

## II.    STANDARD OF REVIEW

The parties have filed competing motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P., Rule 56 (a).  Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality."  Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown

that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers

12

Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995).  Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted).  Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple Univ., 697 F.2d 90, 96 (3d Cir. 1982).  "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969).  Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).  In particular, a plaintiff cannot avoid summary judgment by simply relying upon a self-declaration that he has authored which relies not on evidence, but on the plaintiff's own interpretation of events and, essentially, opinion testimony. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (the nonmoving party may not defeat a properly supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with the conclusory allegations of an

affidavit."); <u>Iseley v. Beard</u>, No. 02-2006, 2009 U.S. Dist. LEXIS 52014, *32 (M.D.

Pa. Mar. 30, 2010) (conclusory allegations contradicted by documentary evidence

cannot be accepted as true).

Finally, " '[w]hen confronted with cross-motions for summary judgment ... "the

court must rule on each party's motion on an individual and separate basis,

determining, for each side, whether a judgment may be entered in accordance with the

summary judgment standard. " ' <u>Transguard Ins. Co. of Am., Inc. v. Hinchey</u>, 464

F.Supp.2d 425, 430 (M.D.Pa.2006) (quoting <u>Marciniak v. Prudential Fin. Ins. Co. of

Am.</u>, 184 Fed.Appx. 266, 270 (3d Cir.2006)).  'If review of [the] cross-motions

reveals no genuine issue of material fact, then judgment may be entered in favor of

the party deserving of judgment in light of the law and undisputed facts.' <u>Id</u>. (citing

<u>Iberia Foods Corp. v. Romeo</u>, 150 F.3d 298, 302 (3d Cir.1998))." <u>Pellicano v. Office

of Pers. Mgmt., Ins. Operations</u>, No. CIV.A. 11-405, 2014 WL 1268051 (M.D. Pa.

Mar. 26, 2014) <u>reconsideration denied sub nom. Pellicano v. Office of Pers. Mgmt.</u>,

No. CIV.A. 11-405, 2014 WL 3565420 (M.D. Pa. July 18, 2014).

## III.   **DISCUSSION**

### A.   **Belnick's Tort Claims are Preempted by the ICCTA**

In Counts II-IV of the amended complaint, Belnick claims that TBB is liable

for breaching its fiduciary duty to Belnick, by tortiously interfering with Belnick's

efforts to enter into other contractual arrangements with shippers, and for fraudulently inducing Belnick to continue renewing the Subscriber Agreement by making false representations about the services that TBB could provide, and about Belnick's ability to negotiate rates with other third-party carriers.

TBB claims that all of Belnick's tort claims fail as a matter of law, and leads with its chief argument that each of Belnick's tort claims are preempted by the ICCTA, which includes a provision that broadly preempts extra-contractual claims that relate to rates and services provided by shipping brokers such as TBB. Upon consideration of the law in this field, and finding the law to be well settled that the ICCTA preempts state-law claims having more than a tenuous or peripheral effect on a motor carrier's rates, routes and services where the claim involves the enforcement of state-law regulation or policy exceeding the conditions that the parties voluntarily contracted for, we conclude that Belnick's tort claims in this action are entirely preempted by federal statute, and that TBB is entitled to judgment in its favor on Counts II-IV.

The ICCTA restricts a state's ability to regulate certain types of carriers and others involved in the shipping industry, including federally-licensed brokers such as TBB. In relevant part, the ICCTA provides the following sweeping preemption provision that restricts enforcement of state law over motor carriers and brokers:

> [A] State, political subdivision of a State, or political authority of 2 or more   States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 U.S.C. § 14501(c)(1).  This provision was originally included as part of the Federal Aviation Administration Authority Act, and was modeled after language that was found in the Airline Deregulation Act of 1978.  See Yellow Transp., Inc. v. DM Transp. Management Servs., Inc., No. Civ. A. 2:06CV1517-LDD, 2006 WL 2871745, *2 (E.D. Pa. July 14, 2006).  The United States Supreme Court has not yet issued a decision interpreting the foregoing provision of the ICCTA, but it has interpreted a "virtually identical preemptive provision" in the Airline Deregulation Act "in a broad and expansive manner."  Id. (citing Gary v. The Air Group, Inc., 397 F.3d 183, 186 (3d Cir. 2005) (stating that the Supreme Court has given "broad interpretation" to the preemption provision of the ADA); see also Rockwell v. United Parcel Serv., Inc., No. 2:99 CV 57, 1999 WL 33100089, at *1 (D. Vt. July 7, 1999) (observing that the preemption provision of 49 U.S.C. § 14501(c)(1) is interpreted "broadly and extensively").

In Morales v. Trans World Airlines, Inc., 504 U.S. 374 (1992), the Supreme Court construed the words "relating to" as preempting all state enforcement actions that have "a connection with or reference to airline 'rates, routes, or services'" in

16

more than a tenuous, remote or peripheral manner. Id. at 383-84. Notably, the Supreme Court has also instructed that the phrase "enact or enforce any law," which is included in section 14501(c)(1), is to be interpreted broadly to prohibit the enforcement of state laws, statutes, regulations or other policies that extend beyond those contracted for by the parties, including state-law tort claims, which impose obligations that are separate and apart from those conditions to which the parties agreed. American Airlines, Inc. v. Wolens, 513 U.S. 219, 232-33 (1995).

Courts have subsequently interpreted the Supreme Court's guidance in this field to extend to the preemptive provision of the ICCTA, since the Supreme Court's "broad construction of the preemption provision of the ADA provides an analogical framework by which to interpret § 14501(c)(1) of the ICCTA." Yellow Transp., 2006 WL 2871745, *2 (citing Mastercraft Interiors, Ltd. v. ABF Freight Sys., Inc., 284 F. Supp. 284, 286-88 (D. Md. 2003); see also Chatelaine, Inc. v. Twin Modal, Inc., 737 F. Supp. 2d 638, 643 (N.D. Tex. 2010) (plaintiff's state-law claims other than those for breach of contract preempted by 49 U.S.C. § 14501(c)(1)); Mastercraft Interiors, Ltd., 284 F. Supp. 2d at 288 (claims for misrepresentation, negligent misrepresentation, and unjust enrichment preempted); Deerskin Trading Post, Inc. v. United Parcel Serv. of Am. Inc., 972 F. Supp. 665, 672-73 (N.D. Ga. 1997) (state-law tort claims relating to carrier's prices, routes, or services found to be a state

17

enforcement action preempted by § 14501(c)(1)); <u>Western Parcel Express v. United Parcel Serv. of America, Inc.</u>, No. C-96-1526-CAL, 1996 WL 756858, at *1-2 (N.D. Cal. Dec. 3, 1996) (in suit for tortious interference with business relations, court found "14501(c)(1) and 41713(b)(4) preempt the application of all state laws related to UPS's prices, routes or services, not merely those that conflict with federal laws.").

In this case, notwithstanding the undisputed fact that Belnick and TBB were party to a long-standing contract for the provision of brokerage and shipping services, Belnick has attempted to bring separate state-law claims alleging that TBB also tortiously interfered with Belnick's ability to contract with other 3PLs and obtain alternative rates that Belnick hoped would be more competitive, fraudulently induced Belnick to continue under its contract with TBB by making promises that TBB had no ability or intention of keeping, and by breaching fiduciary obligations that Belnick claims TBB had as its agent.  Although Belnick argues strenuously that these claims should be permitted to proceed alongside its contract claims, it is now evident that these claims have a direct connection with to the rates that TBB was providing for shipping charges being offered by 3PLs under contract with TBB, and are thus preempted by the ICCTA.

At the outset, we agree with TBB that, as a broker, it comes "within the purview of the ICCTA." <u>AIG Europe Limited v. General System, Inc.</u>, Civ. A. No.

RDB-13-0216, 2014 WL 3671566, at *4 (D. Md. July 22, 2014). Moreover, it is apparent that Belnick's tort claims are hardly peripheral to or only remotely related to shipping rates and services; they are fundamentally and inextricably related to rates and services. Thus, in its claim for tortious interference with contractual relations, Belnick seeks damages that it claims it incurred by allegedly being prevented from negotiating rates and entering contracts directly with carriers under contract to TBB, and instead being stuck with the rates available through TBB. (Doc. 45, ¶¶ 50-58.) Likewise, Belnick's claim for fraudulent inducement alleges that TBB misrepresented its provision of rates and Belnick's ability to negotiate rates, as well as its ability to provide Belnick information in a particular manner that Belnick contends caused it to renew its contract with TBB, which was, of course, for the provision of transportation brokerage services. (Id. ¶¶ 60-76.) Finally, in Count IV, Belnick alleges that TBB breached a fiduciary obligation that TBB had to negotiate rates as Belnick's agent. It is evident that each of these claims relates directly to shipping and brokerage services, and the negotiation of shipping rates, and are allegedly in addition to the contractual obligations imposed on TBB under the parties' Subscriber Agreement – which was, itself, a contract providing for transportation brokerage services. Although Belnick suggests TBB's preemption argument is no more than a red herring that should be dismissed out of hand, Belnick never persuasively argues

why this is so, nor does Belnick squarely or effectively address the caselaw emanating from multiple district courts confronting similar claims and uniformly finding that these types of claims are preempted under the ICCTA.

Far from being a mere red herring or distraction, TBB's preemption argument is compelling, and rests on substantial legal authority instructing that state-law tort claims that seek to impose duties outside of those that the parties contracted for, and which fundamentally relate to shipping and shipping rates, are preempted by section 14501(c)(1).  That same result is warranted in this case, which properly construed hinges on a contractual dispute – one that, as discussed below, involves disputed issues of fact regarding what the scope of that contract was, whether it was breached by either party, and what relief may be available if it was breached.

## B.    Disputed Issues of Fact Preclude Summary Judgment on Belnick's Contract Claims

In the amended complaint, Belnick has alleged that the Subscriber Agreement is valid and enforceable, (Doc. 45 ¶ 43.), and that Belnick has entirely performed all of its obligations under the Agreement, (Id. ¶ 44).  In contrast, Belnick claims that TBB breached the Subscriber Agreement in a number of ways, including (1) by failing to provide adequate access to what it calls "real time rates" for Belnick and its

customers;[1] failing to respond to complaints that Belnick repeatedly lodged regarding the quality of TBB's services, particularly with respect to its computer system and the technology used to provide Belnick and its customers with RTR; TBB's alleged failure to negotiate with carriers on Belnick's behalf in good faith; TBB's alleged failure to load rate information onto Belnick's software system; and TBB's refusal to make good on a promise to allow Belnick to obtain rates directly from other carriers. Some of these claims are predicated on an assertion that TBB breached its duties under the written contract itself, and others are based upon a claim that the parties orally modified and amended the written Subscriber Agreement.

TBB, in contrast, maintains that it has complied with all of its obligations under the Subscriber Agreement as written, and disputes that the parties modified this agreement in any way. Instead, TBB argues that any accommodations that TBB may have agreed to were intended to benefit a longstanding customer and were never

---

[1] The record indicates that "real time rates", or RTR, has a meaning within the industry as "a rate that is delivered by a system upon the request through technology by the user of the technology," which apparently included technology that TBB offered to Belnick. (Doc. 64, ¶ 29, Ex. B, Dep. of Phil Polakoff, p. 18.) It was described elsewhere as "Any time that you want to quote a shipment through a process, you are able to go out, and based on the information you provide[,] receive back an estimate of the charges." (Doc. 64, ¶ 30, Ex. J, Dep. of James Graham, pp. 49-50.) In layperson's terms, it appears that RTR simply means current shipping rates that would be charged based upon the shipping needed, which would enable a distributor to select the best or most efficient shipping service for a particular shipment.

intended to bind TBB to new or different contractual obligations and burdens other than those specified in the language of the Subscriber Agreement.   TBB also construes its obligations under the contract very narrowly, and grades its performance under the Subscriber Agreement significantly more favorably than Belnick.

The dispute over the scope of TBB's obligations under the Subscriber Agreement implicates the Pennsylvania law of contract interpretation – a law that the Third Circuit Court of Appeals has observed is "somewhat complicated" with broad principles that are "clear," but nevertheless not a "seamless web." Bohler-Uddehold America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 92 (3d Cir. 2001).

Under Pennsylvania law, to establish a claim for breach of contract, a complaining party must prove (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by that contract; and (3) resulting damages. Reed v. Chambersburg Area Sch. Dist., 951 F. Supp. 2d 706, 726 (M.D. Pa. 2013); Electron Energy Corp. v. Short, 597 A.2d 175, 618 A.2d 395 (Pa. 1993). A valid and binding contract exists when the parties have manifested an intention to be bound, the terms of the contract are sufficiently definite, and there is consideration.  In re Estate of Hall, 731 A.2d 617, 621 (Pa. Super. Ct. 1999).

A written contract, such as exists in this case, may be modified, but any such modification must be proved by clear, precise and convincing evidence, which may

be done through evidence of conduct that "clearly shows the intent to waive the requirement that the amendments be made in writing." Somerset Community Hosp. v. Allan Mitchell & Assocs., 685 A.2d 141, 146 (Pa. Super. Ct. 1996); see also Gloeckner v. School Dist. of Baldwin Tp., 175 A.2d 73, 75 (Pa. 1961) ("An oral contract changing the terms of a written contract must be of such specificity and directness as to leave no doubt of the intention of the parties to change what they had previously solemnized by a formal document.").[2]

With respect to the interpretation of a written contract, Pennsylvania law begins with the "'firmly settled' point that 'the intent of the parties to a written contract is contained in the writing itself." Bohler-Uddehold America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 92 (3d Cir. 2001) (quoting Krizovensky v. Krizovensky, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)). Accordingly, "'[w]here the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence,' instead, the meaning of a clear and unequivocal written contract 'must be determined by its contents

---

[2] A claim for breach of an oral contract requires proof of the same elements as breach of a written contract. Bill Goodwin Const., LLC v. Wondra Const., Inc., No. 13-157, 2013 WL 4005307, at *8 (M.D. Pa. Aug. 5, 2013). In order to prove the existence of an oral contract, a party seeking to enforce such contract must demonstrate that (1) both parties manifested an intention to be bound by the terms of the agreement; (2) the terms of the agreement were sufficiently definite to be enforced; and (3) there was mutuality of consideration. York Excavating Co., Inc. v. Employers Ins. of Wausau, 834 F. Supp. 733, 740 (M.D. Pa. 1993).

alone.'"  Id. (quoting Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982)) (further

citations omitted).  Thus,

> Where language is clear and unambiguous, the focus of interpretation is
> upon the terms of the agreement as manifestly expressed, rather than as,
> perhaps, silently intended.  Clear contractual terms that are capable of
> one reasonable interpretation must be given effect without reference to
> matters outside the contract.

Id. (internal quotations and citations omitted).   In contrast, however, where a

contract's terms are unclear, or susceptible of more than one reasonable

interpretation, courts are free to consider extrinsic evidence in order to resolve

ambiguity.  However, a contract

> will be found ambiguous if, and only if, it is reasonably or fairly
> susceptible of different constructions and is capable of being understood
> in more senses than one and is obscure in meaning through
> indefiniteness of expression or has a double meaning.  A contract is not
> ambiguous if the court can determine its meaning without any guide
> other than a knowledge of the simple facts on which, from the nature of
> the language in general, its meaning depends; and a contract is not
> rendered ambiguous by the mere fact that the parties do not agree on the
> proper construction.

Id. (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 614 (3d

Cir. 1995) (quoting Samuel Rappaport Family Partnership v. Meridian Bank, 657

A.2d 17, 21-22 (Pa. Super. Ct. 1993)).  To determine whether ambiguity exists in a

contract, the court may consider "the words of the contract, the alternative meaning

suggested by counsel, and the nature of the objective evidence to be offered in

support of that meaning." Id. (quoting Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980)).

In this case, Belnick has argued that the scope of TBB's obligations under the Subscriber Agreement was both broader and more precise than may necessarily be conveyed by the language in the spare written contract itself, and Belnick has also asserted that the parties modified the scope of TBB's services under the contract over the course of many years, including during the later years to require that TBB provide access to RTR and the provision of RoadRunner rates onto Belnick's system.  TBB asserts that no such obligations existed under the agreement, or that it fully met those obligations if they are found to have been grafted onto the parties' contract.[3]

TBB notes that with respect to the provision of rate information, the Subscriber Agreement states only that TBB will "provide rate quote information from public information sources or from private information material maintained by [TBB] on specified shipment movements" and provides that the quotes "will be available to [Belnick] on the day of the quote."  (Doc. 45, Ex. A, Subscriber Agreement.)  TBB points to evidence indicating that Belnick agreed that the Subscriber Agreement

---

[3] As an example of how differently the parties view TBB's obligations under the Subscriber Agreement, TBB contends it did not even have a duty to provide "adequate" access to rates for Belnick and its customers, (Doc. 67, at 12.), whereas Belnick claims TBB's duty was to provide RTR and to do so in a timely and dependable way, something that TBB knew Belnick needed for its operations.

merely required that TBB "provide rate quote information" to Belnick in order to satisfy this contractual obligation, and TBB contends that the evidence shows that it complied fully with this single obligation.  TBB notes that the Subscriber Agreement lacks any detailed requirement regarding the nature or type of access to rates that TBB was obligated to provide to Belnick – something that TBB claims Belnick has acknowledged.

Belnick takes a decidedly different view of the contract's scope and of TBB's performance under the Subscriber Agreement.  Although the precise terms of the Subscriber Agreement obligated TBB only to "provide rate quote information," Belnick contends that this provision obligated TBB to provide what it refers to as "adequate access" to RTR and also to RoadRunner rates – performance that Belnick claims frequently did not occur because of shortcomings in TBB's computer system, which Belnick claims was frequently down, and increasingly so during the last two years of the parties' relationship.  Belnick claims either that the Subscriber Agreement was modified to include an obligation that TBB provide these additional services, or that the parties had a separate enforceable oral contract for the provision of these services.

TBB would have the Court read the Subscriber Agreement narrowly, and in a way that would give rise to virtually no obligation on TBB's part with respect to the

provision of rate information, and even with no obligation that the provision of this information be "adequate" – but also in a manner that leaves some question as to how TBB was obliged to provide the information to Belnick.   The record, however, contains evidence that indicates that the provision of rates, and information about rates, and timely access to that information, was a recurring issue within the parties' commercial relationship, and increasingly became a point of contention for Belnick, who claimed that it was routinely unable to get the very information it needed from TBB to manage its distribution of goods to customers.   (Doc. 64, ¶¶ 69-70, Ex. E.) Belnick also points to this evidence as support for its claim that TBB assured Belnick that it could provide this information, and understood the importance of this information for Belnick's customers.   (Id.)   It is submitted that question of what exactly the Subscriber Agreement required of TBB with respect to the provision of rate information cannot be resolved on summary judgment because resolution depends on resolution of numerous disputed issues of fact.

The parties present sharply divergent pictures regarding the adequacy of TBB's provision of rate information.   Belnick has presented evidence to show that TBB's website suffered from frequent delays and downtime, with one Belnick employee complaining to her contact at TBB that "[i]t seems that almost daily now, my team and I are experiencing service interruptions/delays when using TBB Express.

Periodically the site will 'go down' and we are unable to obtain shipping rates.  This slows me and my team down dramatically."  (Doc. 64, ¶ 83, Doc. 65, Ex. E, TBB3884-3885 (Email from Amanda Key to Kelly Smith dated June 4, 2012; see also Doc. 64, ¶ 42 (Belnick complaining that the disruptions in service were a "disaster"; ¶ 47 (Amanda Key reporting to Sean Belnick on June 4, 2012, that TBB rates had been unavailable for 90 minutes); ¶ 48 (TBB's website down for three hours on April 3, 2013, prompting Sean Belnick to question why the website could not be "marginally stable"); ¶ 50 (Sean Belnick complaining on April 10, 2013, that "when TBB's system goes down, all of our services that rely on TBB go down . . . our customers go to our website for a quote, they get nothing back"); ¶ 51 (reports on April 30, 2013, that TBB site was not providing any information about carriers).)

TBB counters with other record evidence to support its assertion that "the periods of time in which TBB's system was down and unable to provide quotes was usually a matter of minutes, and that whenever Belnick complained, TBB addressed the problem as soon as possible so that Belnick and its customers could obtain rate quotes once again."  (Doc. 67, at 14; Doc. 69, ¶ 44 (website down only 8 minutes), 45 (website down a month on average, usually for an hour or less); ¶ 46 (Sean Belnick acknowledging that the freight calculator works "is great when it works

(99.9% of the time)."); ¶ 48 (Amanda Key admitting that TBB was "very responsive" to resolving issues with the site)).

The parties take starkly different views of the extent of TBB's obligation to perform its obligations seamlessly and without delay or other problems. TBB asserts that it is commercially unreasonable to expect that it would have guaranteed that its system would work perfectly all the time, and that it would never have agreed to such an unattainable level of service for its customers. Belnick argues that the evidence shows more than sporadic or occasional problems, but a near constant level of service interruptions that were compounded by TBB's failure to communicate promptly and adequately with Belnick about changes to rate information.

Another thread that runs throughout Belnick's claims against TBB, and which feature prominently in the contract claims in particular, is an allegation that TBB demonstrated "bad faith throughout its performance of the Agreement." (Doc. 77, at 12.) To support this contention that TBB violated the duty of good faith and fair dealing that Pennsylvania law imposes under contract law, Frickert v. Deiter Brothers Fuel Co., 347 A.2d 701, 705 (Pa. 1975), Belnick cites to evidence that TBB accepted rate increases for Belnick in order to benefit other TBB customers rather than Belnick (Doc. 64, ¶ 16), the TBB blocked carriers without notifying Belnick of the reasons, including blocking a particular carrier until after a rate increase could go into effect

(id. ¶¶ 18-27), that TBB considered passing along certain charges to Belnick even after the carriers had waived the charges (id. ¶¶ 87-88), and working to undermine Belnick's commercial relationships with other 3PLs (id. ¶¶ 109-116).

TBB maintains that it had no contractual obligation to negotiate with other carriers "in good faith" on Belnick's behalf, but instead was obligated under the Subscriber Agreement only to use its "best efforts to route shipments over the best available routes and at competitive prices consistent with the quality of the transportation carrier being utilized." TBB notes that as a 3PL, it based its brokerage decisions, in part, on consideration of the aggregate of its customer volume in order to negotiate favorable shipping rates for all of its customers, including Belnick, but that it had no additional obligation on top of this. (Doc. 67, at 18-19; Doc. 69, ¶¶ 78-86.) Moreover, to the extent such an agreement did exist, TBB claims that it was satisfied because TBB endeavored to negotiate favorable rates whenever possible, and even to mitigate rate increases or to withhold those increases at its own expense. (Doc. 69, ¶¶ 88-97.)

As the foregoing suggests, the parties have dramatically different interpretations regarding what exactly TBB was obligated to do in terms of providing rate information and other related services to Belnick under the Subscriber Agreement as written, or under a possible oral modification to that agreement, or even under a

30

separate oral contract that the parties negotiated over years of dealings with one another.  It is submitted that rather than demonstrate an absence of material fact, the parties have highlighted a record that shows fundamental differences of interpretation regarding an agreement that spanned years in this particular industry. Because disputed issues of fact relevant to the issue of contract interpretation, the scope of the parties' agreement, and the TBB's performance under that contract, it is recommended that both the plaintiff's and the defendant's motions for summary judgment be denied with respect to Belnick's breach of contract claims contained in Count I of the amended complaint.

### C. Summary Judgment is Not Warranted on TBB's Breach of Contract Claim with Respect to the 90% Provision

In its counterclaims, TBB alleges that for years Belnick breached the Subscriber Agreement by failing to tender at least 90% of its shipments through TBB. The Subscriber Agreement, which was effective from November 1, 2005, through October 31, 2013, contained the following provision:  "[Belnick] commits to the use of such broker services for no less than ninety percent (90%) of [Belnick's] (outbound prepaid and inbound collect) total less than truckload ("LTL") shipments during the term of this Agreement including each renewal term, and ninety percent (90%) of [Belnick's] (outbound prepaid and inbound collect) truckload ("T/L")

shipments during the term of this Agreement including each renewal term, and ninety

percent (90%) of [Belnick's] (outbound prepaid and inbound collect) domestic air

freight shipments (excluding parcel transportation) during the term of this Agreement

including each renewal term" (the "90% provision").  (Doc. 45, Ex. A, Subscriber

Agreement, Section C.)  TBB has submitted a spreadsheet showing that for years,

Belnick shipped less than 90% of its shipments using TBB's brokerage services, and

thus plainly violated the 90% provision.  In this regard, TBB notes than in 2010,

Belnick used TBB for only 65% of its shipments, in 2011 for only 44% of its

shipments, in 2012 for only 46% of its shipments, and in 2013, only 6%.  (Doc. 69,

¶¶ 257-60, Ex. D-9, Appendix, Tab 110.)

TBB argues that this provision of the agreement was never altered or modified,

and supports this assertion by noting that the Subscriber Agreement expressly

provides that "No modification of this Agreement and no waiver of its terms shall be

valid unless in writing, signed by both parties."  (Doc. 45, Ex. A, Section L.)

Belnick's CEO, Gary Glazer, testified that Belnick was not aware of any document

having been signed by the parties waiving the 90% provision.  There really is no

dispute that Belnick never used TBB brokerage services for 90% of its shipments; the

issue is whether Belnick's failure to do so amounts to a breach of the contract, or

whether TBB waived enforcement of the 90% provision or is otherwise estopped from asserting this contract provision.

A no-waiver provision of a contract, such as that contained in the Subscriber Agreement, is valid and enforceable under Pennsylvania law. National Data Payment Systems, Inc. v. Meridian Bank, 212 F.3d 849, 855 (3d Cir. 2000).  In some cases, however, Pennsylvania law will recognize an implied waiver where a party allegedly in breach of a contract can show that it was "misled and prejudiced" by a counterparty's failure to enforce the contract's terms.  Id.; see also National Data Payment Systems, Inc. v. Meridian Bank, 18 F. Supp. 2d 543, 548 (E.D. Pa. 1998). However, "mere silence or inaction is not a ground for estoppel unless there is a duty to act." Id.  TBB argues that the Subscriber Agreement should be enforced as written, since it was never amended by a writing signed by the parties, and because Belnick cannot show that it was misled or prejudiced by TBB's decision not to enforce the 90% provision for several years, and indeed not until after Belnick initiated this litigation.

Belnick's response is two-fold.  First, Belnick reiterates its view that TBB was in such fundamental breach of its own obligations under the Subscriber Agreement that the agreement was nullified, and that Belnick was excused from performing its own obligations under the contract.  Belnick also argues that it was operating under

33

the reasonable belief that TBB never intended to enforce the 90% provision, and that TBB's own actions or inactions caused Belnick's belief to be reasonable. Belnick notes that TBB reviewed and audited Belnick's RoadRunner bills, and TBB representatives were aware of Belnick's relationship with RoadRunner throughout the eight years that Belnick and TBB operated under the Subscriber Agreement, and knew that Belnick was using RoadRunner services for some of its shipment requirements. Belnick thus argues that TBB should be estopped from claiming a breach for this conduct, and Belnick cites to Pennsylvania authority holding that under an estoppel theory, "a contract may be modified if either words or actions of one party to the contract induce another party to the contract to act in derogation of that contract, and the other justifiably relies upon the words or deeds of the first party." Kreutzer v. Monterey Cty. Herald Co., 747 A.2d 358, 362 (Pa. 200); see also Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1223 (Pa. Super. Ct. 1989) (recognizing implicit waiver, inferred from circumstances, and waiver by estoppel, where a party's conduct misleads another party into reasonably believing that a provision has been waived).

We find there to be at least a question of fact as to whether TBB knew of and disregarded Belnick's longstanding failure to abide by the 90% provision through TBB's auditing and review of Belnick's shipping information, and whether TBB

thereby caused Belnick to believe reasonably that this aspect of the Subscriber Agreement was not being enforced.  As with other aspects of the parties' contract claims, it is submitted a factfinder must resolve questions about whether Belnick's apparent breach of the Subscriber Agreement was waived or whether TBB is otherwise precluded from pursuing damages for this asserted breach after declining for several years even to raise the issue despite being aware of it.[4]

> **D.  Summary Judgment is Not Warranted on TBB's Claim that Belnick Breached the Subscriber Agreement by Sharing Confidential Information with Third Parties**

The Subscriber Agreement provides that "[a]ll information pertaining to fees under this Agreement and pricing made available through the [TBB] service(s), as well as any information involving the relationship between [TBB] and transportation companies used to move the cargo of [Belnick], is considered proprietary between [TBB] and [Belnick] and is not to be disclosed to any third party during the entire period that this Agreement remains in effect" (the "Confidentiality provision"). (Doc.

---

[4]  As discussed below, the Subscriber Agreement provides for the assessment of liquidated damages for breaches of the Subscriber Agreement with respect to brokerage services.  (Doc. 45, Ex. A, Section J.)  It is recommended that any assessment of whether liquidated damages may be available for any breach of 90% provision should await further proceedings, so the Court can make an adequate determination as to whether the liquidated damages provision is enforceable under Pennsylvania law.  Given the factual uncertainty regarding this counterclaim, it would be premature to address the damages that may be available in the event the claimed breach is proven.

45, Ex. A, Section L.)  TBB highlights evidence in the record showing that Belnick frequently violated the Confidentiality provision by sharing with carriers and other 3PLs information that TBB had marked as confidential and proprietary, including information about rates, discounts, accessorial charges, favorable rules and other pricing information that TBB negotiated.  TBB argues that the information shared with third parties is precisely the type of information that is contemplated in the Confidentiality provision, which TBB's seeks to keep confidential for legitimate business reasons.

Belnick again argues that TBB's own breaches of the Subscriber Agreement vitiate its ability to enforce the Confidentiality provision.  Additionally, Belnick asserts that the information that TBB claims was confidential is so broad in scope that the provision should be deemed unenforceable.  Finally, Belnick argues that even if it did violate the Confidentiality provision by sharing some of the many documents that TBB reflexively stamped as "confidential" or "proprietary," TBB should not be permitted to recover liquidated damages for such breach because such damages would amount to an unenforceable penalty bearing no relation to the actual injury suffered.

Belnick's argument that it did not breach the Confidentiality provision by disclosing confidential information rests on thin support.  Belnick criticizes TBB's decision liberally to mark documents as confidential, or to suggest that TBB sought

to protect too vast a body of information, but Belnick essentially ignores the fact that the parties agreed to the scope of the Confidentiality provision set forth in the Subscriber Agreement, and Belnick has acknowledged that it shared with third parties documents that would fall within the scope of the Confidentiality provision.  Out of an abundance of caution, however, and because we are recommending that the parties' competing contract claims be presented to a factfinder at trial, we will also recommend that the Court decline to grant summary judgment in TBB's favor at this time in order to allow Belnick an opportunity to contest this alleged breach at trial, and to dispute TBB's claim for damages resulting therefrom.

In particular, it is TBB's claim for liquidated damages for this particular breach that warrants caution, since it is not clear from the record whether the liquidated damages provision of the Subscriber Agreement represents a fair estimate of damages for this alleged breach, or whether it amounts to an unenforceable penalty.

Under Pennsylvania law,

> where the breach of agreement admits of compensation, the recovery may be limited to the loss actually sustained, notwithstanding a stipulation for a penalty. [The rule] is founded upon the principle that one party should not be allowed to profit by the default of the other, and that compensation and not forfeiture is the equitable rule.

Holt's Cigar Co. v. 222 Liberty Assoc., 591 A.2d 743, 747 (Pa. Super. Ct. 1991) (citing Kunkle v. Wherry, 42 A. 112 (Pa. 1899)).  In assessing whether a stipulated

damages provision is a penalty, courts "look to the intention of the parties and 'consider the relation which the sum stipulated bears to the extent of the injury which may be caused by the several breaches provided against, the ease or difficulty of measuring a breach in damages[.]'" Brinich v. Jencka, 757 A.2d 388, 402 (Pa. Super. Ct. 2000). Relying on these decisions, and Pennsylvania law instructing that for liquidated damages provisions to be enforceable they must bear some relation between the stipulated damages and the claimed injury, Belnick argues that liquidated damages in excess of $1 million, such as those claimed here, are unreasonable and should not be enforced, since the method used of calculating the stipulated damages is totally unrelated to any supposed injury that TBB suffered from Belnick's disclosure.

The Subscriber Agreement provides that if Belnick breached the agreement "with respect to non-brokerage services," Belnick would be liable for damages "required by law and this Agreement." (Doc. 45, Ex. A, Subscriber Agreement, Section J.) The same provision provides that if Belnick breached the Subscriber Agreement "with respect to brokerage services," Belnick would be liable for liquidated damages based upon a calculation of the historical net profit that TBB would have billed but for the breach. It appears that TBB is claiming that it is entitled to enforce the liquidated damages provision, and to calculate damages for both

Belnick's alleged breach of the 90% provision and the Confidentiality provision based upon a claim that each breach was "with respect to brokerage services." If this is TBB's theory, it is not clear that the breach of the Confidentiality agreement comes within "brokerage services," and even if it does we have some concern that the formula used to calculate damages bear little, if any, relation to the injury ostensibly suffered by Belnick's breach of the Confidentiality provision.

The Subscriber Agreement recites that damages resulting from breaches with respect to brokerage services are "difficult to determine" because of the "unique nature of the services and the contract commitments of [TBB] to third party transportation companies." For this reason, where the Subscriber Agreement is breached with respect to brokerage services, liquidated damages are calculated either by reference to historical net profit that would have been realized had the breach not occurred, or by 15% of the gross billings that would have been generated had the breach not occurred. (Doc. 45, Ex. A, Section J.) This calculation appears to be based upon a potential breach of the provision of actual brokerage services that would be used to arrange the shipment of goods (e.g., Belnick's failure to use TBB for 90% of its shipping needs), but seems to bear no relation to other potential breaches of the contract that would seem unrelated to use of the actual brokerage services themselves (e.g., sharing with a third party a document marked "confidential").

Thus, although we believe that the evidence supports TBB's assertion that Belnick breached the Confidentiality provision by sharing confidential or proprietary information with third parties, and although we believe that Belnick's argument that TBB's alleged breaches permitted Belnick to disregard the contract entirely is relatively weak, there remain sufficient questions regarding whether Belnick breached the agreement, the scope of such breach, if any, and the damages that should be available – including issues regarding the application of the liquidated damages provision to this particular claim – that should await further proceedings.[5]

### E. Summary Judgment is Not Warranted on TBB's Counterclaim that Belnick Violated the Pennsylvania Uniform Trade Secrets Act

Finally, TBB has brought a counterclaim alleging that Belnick's disclosure of confidential proprietary information to third party shippers and other 3PLs not only

---

[5] The Court recognizes that the question of whether a liquidated damages provision is enforceable is a matter of law to be decided by a Court, but it is not possible in all cases necessarily to make this determination on summary judgment briefs alone. See Holt's Cigar Co., 591 A.2d at 588-89 ("While the final determination of whether a stipulated sum is for liquidated damages or a penalty is one of law for the court to decide, it should be remembered that the pleadings and evidence reduced to findings of fact supply the court with the information necessary to make informed legal conclusions.") (internal citation omitted.)  In this case any decision regarding the application of the liquidated damages provision in the Subscriber Agreement should await the presentation of evidence at trial.

amounted to a breach of the Subscriber Agreement, but also violated Pennsylvania

Uniform Trade Secrets Act, 12 Pa. Cons. Stat. Ann. §§ 5301 et seq. ("PUTSA").

> The PUTSA defines a trade secret as

> Information, including a formula, drawing, pattern, compilation
> including a customer list, program, device, method, technique or process
> that:

>> (1) Derives independent economic value, actual or
>> potential, from not being generally known to, and not being
>> readily ascertainable by proper means by, other persons
>> who can obtain economic value from its disclosure or use.
>> (2) Is the subject of efforts that are reasonable under the
>> circumstances to maintain its secrecy.

12 Pa. Cons. Stat. Ann. § 5302.

In order to constitute a "trade secret" under the PUTSA, the information "must

be an actual secret of peculiar importance to the business and constitute competitive

value to the owner." Youtie v. Macy's Retail Holding, Inc., 653 F. Supp. 2d 612, 620

(E.D. Pa. 2009) (citing Parson v. Pa. Higher Educ. Assistance Agency, 910 A.2d 177,

185 (Pa. Commw. Ct. 2006). The "crucial indicia for determining whether certain

information constitutes a trade secret are 'substantial secrecy and competitive value

to the owner.'" Id. (quoting O.D. Anderson, Inc. v. Cricks, 815 A.2d 1063, 1070 (Pa.

Super. Ct. 2003)). Factors that courts consider in determining whether given

information is a trade secret include:  (1) the extent to which the information is

known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  Id.; see also SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1255-56 (3d Cir. 1985); Iron Age Corp. v. Dvorak, 880 A.2d 657, 663 (Pa. Super. Ct. 2005).

Courts have found "trade secrets" to include "certain business and marketing information including the costing and pricing information of an employer's product or services, an employer's business plans, marketing strategies, and financial projections and the terms of specific customer accounts including contract expiration dates and revenues generated."  BIEC Intern., Inc. v. Global Steel Services, Ltd., 791 F. Supp. 489, 545 (E.D. Pa. 1992); see also Youtie, 653 F. Supp. 2d at 621 (providing other citations recognizing similar types of information as trade secrets under the law).  To establish misappropriation by disclosure under the PUTSA, TBB must establish that Belnick disclosed its trade secrets without express or implied consent and either:

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(A) derived from or through a person who had utilized improper means to acquire it;

(B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

© derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 Pa. Cons. Stat. Ann. § 5302.

TBB argues that the information that Belnick obtained and shared with third parties includes sensitive information about its brokerage business and pricing models, based on a complex structure of rates, discounts, accessorial charges, favorable rules and other pricing that TBB incurs time, expertise and expense to formulate for customers like Belnick.  TBB also maintains that this information is what gives it competitive advantage in the brokerage market, and if disclosed to competitors would undermine its operations.  TBB has presented evidence to show that it maintains such information confidentially and does not share or make available this information with third parties.  TBB also includes confidential provisions in its contracts with its customers, such as Belnick, and marks its documents with phrases such as "Created by TBB Global Logistics for Belnick, Inc." and "Confidential and

43

Proprietary." (Doc. 69, TBB Statement of Facts, ¶¶ 275-284.) TBB also reminded Belnick of its obligation to hold in confidence its trade secret information, and not to disclose it with third parties. (Id. ¶ 287; Doc. 45, Ex. B, Letter to Phil Polakoff to Sean Belnick dated September 29, 2010 ("We alert you to your continuing obligation under the subscriber agreement that all information pertaining to fees and pricing made available through services of TBB be considered proprietary by you and is not to be disclosed to any third party.").) Despite this warning, it is undisputed that Belnick shared this information with third parties, including other shippers and 3PLs.

Belnick does not dispute that it shared some of the information that was labeled as proprietary and confidential, but argues nonetheless that the only evidence that these materials actually constituted trade secrets entitled to protection under the law is a self-serving declaration of Phil Polakoff. Belnick argues that far from constituting actual trade secrets, the documents reflect that Belnick shared with TSG only certain accessorial charges; general rates for shipments with no identification of which carriers the rates were for and no underlying data; a "freight expense detail" that does not identify rates; and documents that TSG produced that had no underlying rate information. (Doc. 68, Tabs 131-133, 137.) Belnick argues that there is no methodology, no range of data, no breakdown, and no underlying data from which anyone could determine TBB's pricing markup. For these reasons, Belnick contends

44

that the very information that it shared is not deserving of trade secret protection, regardless of TBB's own subjective claim that the information was sensitive. Belnick also argues that the liquidated damages provision in the contract should be deemed a penalty, and should not be imposed for any disclosure of the information that it shared with TSG.

Although TBB has made a substantial showing through Phil Polakoff's declaration regarding the nature of the alleged trade secrets that were disclosed, we find that a final determination on this claim should await further proceedings so that the Court may hear actual evidence regarding the nature of the information disclosed in order to more fairly ascertain whether and to what extent the information shared actually amounts to a trade secret, and what damages, if any, were caused by misappropriate and disclosure to third parties.

## IV.   RECOMMENDATION

Accordingly, it is recommended that Belnick's motion for partial summary judgment (Doc. 62.) be DENIED in its entirety. It is further recommended that TBB's motion for summary judgment (Doc. 66.) be GRANTED with respect to Belnick's tort claims set forth in Counts II-IV of the amended complaint, and denied in all other respects.

It is further recommended that any decision regarding TBB's claim for attorneys' fees and costs that it claims under the Subscriber Agreement be deferred until the conclusion of trial in this matter.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 9th day of March, 2015.


_S/Martin C.  Carlson_
Martin C. Carlson
United States Magistrate Judge